JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
ELLEN M. RICHMOND (State Bar No. 277266)
ellen.richmond@mto.com
JOSHUA PATASHNIK (State Bar No. 295120)
josh.patashnik@mto.com
JOHN B. MAJOR (State Bar No. 306416)
john.major@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:   (415) 512-4000
Facsimile:   (415) 512-4077

JOHN W. SPIEGEL (State Bar No. 78935)
john.spiegel@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiff Airbnb, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| AIRBNB, INC., | Case No. 8:16-cv-1398 |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION OF AIRBNB, INC.; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| vs. | |
| CITY OF ANAHEIM, | |
| Defendant. | Hearing: August 26. 2016 at 9:00 a.m. |

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 26, 2016, at 9:00 a.m. or as soon thereafter as it may be heard, in the above-entitled court, located at 411 West Fourth Street, Santa Ana, CA 92701, Plaintiff Airbnb, Inc. ("Airbnb") will and hereby does move this Court for entry of a preliminary injunction prohibiting enforcement of Sections 4.05.120 and 4.05.130 of the City of Anaheim Municipal Code against Airbnb.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff requests that the Court enjoin Defendant City of Anaheim ("City"), and its agents, servants, employees, and attorneys, from taking any actions to penalize Airbnb—including any investigation, arrest, prosecution, or penalty—for: (a) the publication of rental advertisements or other information of third-party hosts on Airbnb.com; (b) the failure to verify whether a rental listing is associated with a valid permit or is in compliance with other ordinances, regulations, or laws of the City; (c) the failure to remove listings upon notification from the City that such listings do not have a valid permit; or (d) the facilitation of short-term rentals that violate City law.  As set forth in the accompanying Memorandum of Points and Authorities, there is good cause for the relief requested.  Sections 4.05.120 and 4.05.130 violate Airbnb's rights under the Communications Decency Act, as well as the First and Fourteenth Amendments. Airbnb also will suffer irreparable harm absent an injunction; the balance of the equities tips in its favor; and an injunction is in the public interest.

This Motion is based upon this Notice of Motion; the supporting Memorandum of Points and Authorities; the supporting declarations of David Owen and Jonathan H. Blavin filed herewith; all documents and pleadings on file in this action; and such other argument or evidence as may be presented in reply or at the hearing on this motion.

DATED:  July 28, 2016                MUNGER, TOLLES & OLSON LLP


By:   */s/ Jonathan H. Blavin*
      JONATHAN H. BLAVIN
Attorneys for Plaintiff Airbnb, Inc.

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES.................................................1

I.     INTRODUCTION ..................................................................................1

II.    BACKGROUND .....................................................................................4

    A.    Airbnb ...........................................................................................4

    B.    Anaheim's Scheme for Regulating Short-Term Rentals .........................6

III.   ARGUMENT ...........................................................................................9

    A.    Standard for Preliminary Injunction ........................................................9

    B.    Airbnb is Likely To Succeed on the Merits of its Claims .......................10

        1.    The City's Enforcement of the Ordinance Against Airbnb
            Violates and Is Preempted By Section 230 of the CDA................10

            (a)    Hosting Platforms Are "Interactive Computer
                 Service" Providers.................................................................12

            (b)    The Ordinance Treats Platforms as "Publishers"................12

                 (i)    The Ordinance Imposes Liability for
                      Publishing and for Failing to Remove Third-
                      Party Content.............................................................12

                 (ii)   The Ordinance Imposes Liability for Failing to
                      Verify and Screen Third-Party Content...................14

            (c)    Listings On Hosting Platforms Are Provided By
                 "Another Information Content Provider"...........................16

        2.    The Ordinance Violates the First Amendment Because It Is
            a Content-Based Restriction on Speech that Is Not Narrowly
            Tailored to Serve a Substantial Government Interest...................17

        3.    The Ordinance Violates the First Amendment and Due
            Process Clause Because It Imposes Criminal Penalties on
            Speech Without Any Scienter or *Mens Rea* Requirement ............21

    C.    Airbnb Faces Irreparable Harm Unless the Ordinance is Enjoined.........23

    D.    The Balance of Equities and Public Interest Favor Airbnb .....................25

IV.    CONCLUSION .........................................................................................25

i

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Aeroground, Inc. v. City & Cnty. of San Francisco*,
   170 F. Supp. 2d 950 (N.D. Cal. 2001)...................................................25

*Almeida v. Amazon.com, Inc.*,
   456 F.3d 1316 (11th Cir. 2006) ...........................................................14

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009)....................................................4, 24, 25

*Ashcroft v. ACLU*,
   542 U.S. 656 (2004) ............................................................................18

*Backpage.com, LLC v. Cooper*,
   939 F. Supp. 2d 805 (M.D. Tenn. 2013) ............................ 13, 15, 20, 24

*Backpage.com, LLC v. Hoffman*,
   2013 WL 4502097 (D.N.J. Aug. 30, 2013).....................................13, 23

*Backpage.com, LLC v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wash. 2012) ..................................... passim

*Bank One, Utah v. Guttau*,
   190 F.3d 844 (8th Cir. 1999) ..............................................................25

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009)...........................................1, 11, 12, 13

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ........................................................................3, 19

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) .............................................................10

*Bigelow v. Virginia*,
   421 U.S. 809 (1975) ............................................................................17

*Black v. Google Inc.*,
   2010 WL 3222147 (N.D. Cal. Aug. 13, 2010)......................................16

*Braun v. Soldier of Fortune Magazine, Inc.*,
   968 F.2d 1110 (11th Cir. 1992)...........................................................21

*Brown v. Entm't Merchants Ass'n*,
 564 U.S. 786 (2011) .................................................................................18

*Carafano v. Metrosplash.com*,
 339 F.3d 1119 (9th Cir. 2003) .................................................11, 13, 16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
 447 U.S. 557 (1980) .................................................................................18

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
 519 F.3d 666 (7th Cir. 2008) ...................................................................11

*Dart v. Craigslist, Inc.*,
 665 F. Supp. 2d 961 (N.D. Ill. 2009).......................................................11

*Doe v. Friendfinder Network, Inc.*,
 540 F. Supp. 2d 288 (D.N.H. 2008) ........................................................14

*Doe v. MySpace, Inc.*,
 474 F. Supp. 2d 843 (W.D. Tex. 2007), aff'd, 528 F.3d 413 (5th Cir. 2008) ........................................................................................................15

*Edenfield v. Fane*,
 507 U.S. 761 (1993) .....................................................................19, 20, 21

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
 521 F.3d 1157 (9th Cir. 2008) (en banc) .............................. 10, 11, 12, 13

*Farris v. Seabrook*,
 677 F.3d 858 (9th Cir. 2012) .........................................................3, 10, 23

*Florida Bar v. Went For It, Inc.*,
 515 U.S. 618 (1995) .................................................................................18

*Forsyth Cnty. v. Nationalist Movement*,
 505 U.S. 123 (1992) .................................................................................18

*Foti v. City of Menlo Park*,
 146 F.3d 629 (9th Cir. 1998) .....................................................................1

*Gavra v. Google Inc.*,
 2013 WL 3788241 (N.D. Cal. July 17, 2013) .........................................13

MOTION FOR PRELIMINARY INJUNCTION

*Georgia Latino Alliance for Human Rights v. Governor of Georgia*,
    691 F.3d 1250 (11th Cir. 2012) ................................................................23

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ..............................................2, 16

*Green v. Am. Online (AOL)*,
    318 F.3d 465 (3d Cir. 2003) ....................................................................14

*Home Decor Ctr., Inc. v. Google, Inc.*,
    2013 WL 10858861 (C.D. Cal. May 9, 2013) ....................................11, 16

*Inman v. Technicolor USA, Inc.*,
    2011 WL 5829024 (W.D. Pa. Nov. 18, 2011) ..........................................11

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016) ..........................................................11, 14, 17

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ..................................................................25

*Mahroom v. Best W. Int'l, Inc.*,
    2009 WL 248262 (N.D. Cal. Feb. 2, 2009) ..............................................24

*Mazur v. eBay Inc.*,
    2008 WL 618988 (N.D. Cal. Mar. 4, 2008) ........................................11, 14

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ................................................................4, 25

*Mishkin v. New York*,
    383 U.S. 502 (1966) ..................................................................................22

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ..................................................................................23

*New York v. Ferber*,
    458 U.S. 747 (1982) ................................................................................3, 22

*News & Sun Sentinel Co. v. Bd. of Cnty. Comm'rs*,
    693 F. Supp. 1066 (S.D. Fla. 1987) ..........................................................20

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rights*,
    413 U.S. 376 (1973) ..................................................................................21

MOTION FOR PRELIMINARY INJUNCTION

*Reed v. Town of Gilbert*,
　　135 S. Ct. 2218 (2015) ............................................................18

*Satellite Television of N.Y. Assocs. v. Finneran*,
　　579 F. Supp. 1546 (S.D.N.Y. 1984) .......................................23

*Smith v. California*,
　　361 U.S. 147 (1959) ..............................................................22

*Sorrell v. IMS Health, Inc.*,
　　564 U.S. 552 (2011) ..................................................3, 17, 18

*Thompson v. W. States Med. Ctr.*,
　　535 U.S. 357 (2002) ..............................................................20

*Toomer v. Witsell*,
　　334 U.S. 385 (1948) ..............................................................23

*United States v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*,
　　858 F.2d 534 (9th Cir. 1988) ................................................22

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
　　478 F.3d 413 (1st Cir. 2007) .................................................15

*Valle Del Sol Inc. v. Whiting*,
　　709 F.3d 808 (9th Cir. 2013) ................................................19

*Valle del Sol Inc. v. Whiting*,
　　732 F.3d 1006 (9th Cir. 2013) ..........................................3, 23

*Village of Schaumburg v. Citizens for a Better Env't*,
　　444 U.S. 620 (1980) ..............................................................19

*Yniguez v. Arizonans for Official English*,
　　42 F.3d 1217 (9th Cir. 1994) ................................................20

*Zauderer v. Office of Disciplinary Counsel*,
　　471 U.S. 626 (1985) ..............................................................21

**STATE CASES**

*Gentry v. eBay, Inc.*,
　　99 Cal. App. 4th 816 (2002) .................................................11

*Hill v. StubHub, Inc.*,
    219 N.C. App. 227 (2012) .................................................................................11, 17

**FEDERAL STATUTES**

47 U.S.C. § 230 ..................................................................................... passim

**MUNICIPAL ORDINANCES**

Anaheim Mun. Code § 1.01.370 .........................................................................8

Anaheim Mun. Code § 4.05 .................................................................... passim

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   <u>INTRODUCTION</u>

Plaintiff Airbnb, Inc. ("Airbnb") respectfully requests a preliminary injunction enjoining Defendant City of Anaheim ("City") from enforcing against Airbnb Sections 4.05.120 and 4.05.130 of Ordinance No. 6374 (the "Ordinance"), passed by the City Council on July 12, 2016 and purportedly effective on August 11, 2016. The Ordinance unquestionably treats online platforms like Airbnb as the publisher or speaker of third-party content and thus directly conflicts with, and is preempted by, Section 230 of the Communications Decency Act, 47 U.S.C. § 230 (the "CDA"). In addition, the law violates the First Amendment and the Due Process Clause.[1]

The Ordinance fundamentally and impermissibly alters Anaheim's regulatory scheme for short-term rentals by holding "hosting platforms"—defined by the law as entities that "*allow[] the owner to offer to list or advertise*" a rental on the "web site provided" by the platform, § 4.05.030(E)[2] (emphasis added)—criminally and civilly liable for publishing, and for failing to screen and remove, their users' advertisements of rentals that lack City-issued permits or are otherwise not compliant with "any" City law or regulation—including, e.g., whether the rental has "double-keyed dead bolt locks" on "exit doors" or lacks "[s]moke alarms," § 4.05.100.0103(b), (k).

The Ordinance squarely violates the CDA, which prohibits "treat[ing]" websites who host or distribute third-party content, like the hosting platforms at issue here, "as the publisher or speaker of any information provided by another information content provider," and immunizes them from liability under any "inconsistent" state or local law. 47 U.S.C. §§ 230(c)(1), (e)(3); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096,

---

[1]  This action is both an as-applied and a facial challenge against the Ordinance. It is an as-applied challenge in that it seeks only to prohibit the City from enforcing certain provisions of the Ordinance against Airbnb; and it is a facial challenge in that certain provisions, on their face, violate the law and cannot be enforced against any platform. *See Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

[2]  Unless otherwise noted, all references in this format are to the Ordinance, which amends the City's Municipal Code. The Ordinance is attached hereto as Appendix A.

1102 (9th Cir. 2009).  A fundamental purpose of Congress in passing the CDA was to shield website operators from compulsory obligations to screen user content upon pain of liability, and instead to provide them with the incentive to build innovative platforms while having the flexibility to experiment with and develop tools to address undesirable content without fear of legal retribution.  47 U.S.C. §§ 230(b)(1), (2), (4). The scope of this immunity is broad, and applies regardless of whether a website may know that third parties are using its services to create or post unlawful content.  *See Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009).  Since its passage in 1996, the CDA has functioned as the bedrock upon which online services of all kinds and sizes have founded and built their operations.  By subjecting hosting platforms to criminal and civil liability for publishing and for failing to screen and remove non-compliant third-party listings, the Ordinance directly conflicts with the CDA and is barred under settled law.

The City was not blind to the fact that the Ordinance might run afoul of the CDA and other laws.  Indeed, the section imposing duties on hosting platforms states that such provisions "*will not apply if determined by the city to be in violation of any*" applicable federal or state laws.  § 4.05.120.030 (emphasis added).  During a City Council hearing, the City's Director of Planning explained the insertion of this provision, stating that platforms "have protections under various forms of federal law" and "if we've been preempted by federal law, we would not be able to issue that citation."  Declaration of Jonathan H. Blavin ("Blavin Decl."), Ex. A at 8.  Similarly, the acting City Attorney stated that the City was aware that platforms have "federal rights" with "respect to their content," though it was "an issue that we're still looking at."  *Id.* at 24.  The City, however, has not made any determination as to whether the Ordinance is in violation of federal law, and the law will go into effect on August 11.

The Ordinance also violates hosting platforms' First Amendment rights.  The prohibition on the publication of certain ads—i.e., for rentals without valid permits or which are otherwise not legally compliant—is a content-based speech restriction

1   subject to "heightened judicial scrutiny" under the First Amendment.  *Sorrell v. IMS*

2   *Health, Inc.*, 564 U.S. 552, 565 (2011).  The City cannot meet its burden of

3   demonstrating that this speech restriction directly advances a substantial state interest

4   and does so in a narrowly tailored way.  The "normal method of deterring unlawful

5   conduct" is to punish the conduct, rather than prohibit speech regarding it.  *Bartnicki*

6   *v. Vopper*, 532 U.S. 514, 529 (2001).  The City cannot show that the obvious

7   alternative of enforcing its existing laws against third-party owners who rent

8   properties in violation of the law would be ineffective or inadequate.  Just the

9   opposite:  it is clear the City *could* enforce its laws directly against hosts who violate

10   them—as it already does "very effective[ly]," according to the City (Blavin Decl., Ex.

11   A at 4)—rather than indirectly against platforms that publish listings.

12       Additionally, the Act violates the First Amendment and the Due Process Clause

13   of the Fourteenth Amendment as it seeks to impose criminal penalties on hosting

14   platforms like Airbnb without requiring a showing that the platform *knew* the listing

15   at issue was unlawful.  The Supreme Court has rejected the imposition of strict

16   criminal liability for the dissemination of information, even where the content itself

17   lacks First Amendment protection.  *New York v. Ferber*, 458 U.S. 747, 765 (1982).

18       Absent the intervention of this Court, the Ordinance threatens irreparable harm

19   to Airbnb in several ways.  First, Airbnb faces the threat of prosecution and

20   significant penalties—including up to six months in jail and fines up to $2,000 per

21   violation per day—under a preempted state law, which constitutes irreparable harm.

22   *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).  The

23   Ordinance impermissibly coerces Airbnb to comply with its unlawful terms and to

24   screen and remove third-party listings from its site, or face the threat of imprisonment

25   and significant monetary liability.  Further, the imminent violations of Airbnb's

26   constitutional rights "'unquestionably constitute[] irreparable injury.'"  *Farris v.*

27   *Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012).  Airbnb also faces the risk of substantial

28   disruption to its business, and an erosion of customer goodwill, as it effectively will

be required under the Ordinance to remove immediately all Anaheim listings from its website, including for rentals that otherwise may be permitted and lawful. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009).

Given this palpable threat of irreparable harm, the equities tip sharply in Airbnb's favor. Moreover, the public interest is served by enforcing the "Constitution's declaration that federal law is to be supreme," *id*. at 1059-60, and preventing the "violation of" Airbnb's "constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). By contrast, an injunction would not prevent the City from continuing to enforce its laws directly against hosts who violate them.

For these reasons and those discussed below, the Court should enjoin enforcement of the Ordinance against Airbnb.

## II.   BACKGROUND

### A.   Airbnb

Founded in 2008, Airbnb provides an Internet platform through which persons desiring to book accommodations ("guests"), and persons listing unique accommodations available for rental ("hosts"), can locate each other and enter into direct agreements to reserve and book travel accommodations on a short and long-term basis. Declaration of David Owen ("Owen Decl."), ¶ 2.

Airbnb does not manage, operate, lease or own hosts' accommodations, and it is not a party to the direct agreements between guests and hosts for the booking of rentals offered by hosts. *Id*. ¶ 4. Airbnb's platform provides a means by which hosts can choose to list their rentals; guests can locate those rentals; and hosts and guests can communicate directly to set the terms of their bookings. *Id*. ¶ 3. The platform also provides, through third-party payment processors, a secure payment-processing service to permit hosts to receive payments electronically. *Id*. In consideration for the use of its platform, Airbnb receives a service fee from both the guest and host, determined as a percentage of the accommodation fee set solely by the host. *Id*.

Hosts, and not Airbnb, decide whether to list their properties and with whom

and when to transact, provide the descriptions of their rentals, set their own lengths of stay, and determine their prices. *Id.* ¶¶ 6-7. As Airbnb's Terms of Service state, hosts "alone are responsible for any and all Listings and Member Content [they] post." *Id.*, Ex. 1 at 13. Likewise, the Ordinance itself defines a "hosting platform" as an "entity that facilitates a short-term rental for an owner," i.e., "*allow[s] the owner to offer to list or advertise* the short-term rental on the Internet web site provided or maintained by the hosting platform." § 4.05.030(E) (emphasis added).

Airbnb advises its hosts and guests to be aware of and comply with local laws in listing and renting units listed on Airbnb. The Airbnb Terms of Service reference at their outset parties' "OBLIGATIONS TO COMPLY WITH APPLICABLE LAWS AND REGULATIONS," and that

> IN PARTICULAR, HOSTS SHOULD UNDERSTAND HOW THE LAWS WORK IN THEIR RESPECTIVE CITIES. SOME CITIES HAVE LAWS THAT RESTRICT THEIR ABILITY TO HOST PAYING GUESTS FOR SHORT PERIODS…. IN MANY CITIES, HOSTS MUST REGISTER, GET A PERMIT, OR OBTAIN A LICENSE BEFORE LISTING A PROPERTY OR ACCEPTING GUESTS. CERTAIN TYPES OF SHORT-TERM BOOKINGS MAY BE PROHIBITED ALTOGETHER.

Owen Decl., Ex. 1 at 8. Similarly, Airbnb's website informs hosts that "it's important for you to understand the laws in your city," provides an overview of the sorts of regulations that apply to Airbnb hosts, and notes that "[s]ome cities or counties may require a special permit to rent out your home." *Id.*, Ex. 2 at 65.

As part of the Airbnb Community Compact, the company is committed to helping promote responsible home sharing to make cities stronger. *See id.* ¶ 10 & Ex. 3. For example, Airbnb discretionarily removes listings that it believes may be offered by hosts with multiple "entire home" listings or by unwelcome commercial operators. *See id.* ¶ 10. If Airbnb is alerted to shared spaces or private rooms that appear to be operated by unwelcome commercial operators or that do not reflect the community vision, it generally will remove such listings. *See id.*

### B.   Anaheim's Scheme for Regulating Short-Term Rentals

The Ordinance amends the City's short-term rental law to impose penalties on hosting platforms, like Airbnb, that list or advertise certain non-compliant short-term rentals.  The law further prevents the issuance of new short-term rental permits to owners in residential districts, though it allows certain short-term rentals that have already received or applied for a permit or have been authorized by other City laws.

In May 2014, the City Council first enacted a law specifically allowing and regulating short-term rentals in Anaheim. The Council added Chapter 4.05 to Title 4 of the Municipal Code, which allowed short-term rentals—rentals for less than 30 days—within certain zoning districts so long as the owners of those rentals acquired a permit and met other conditions with respect to their rentals.  §§ 4.05.100.0109, 4.05.100.0112.  The City requires owners to include their "City issued permit number" in "all advertising," and prohibits them from advertising rentals that do not "comply with" City law.  §§ 4.05.100.0109; 4.05.040.010.[3]

The City's efforts to regulate short-term rentals have been successful.  Over 350 short-term rental owners in the City have registered and received permits.  Blavin Decl., Exs. B at 31, D at 40.  The City also employs 31 code-enforcement officers to enforce the law, three of whom monitor hosting platforms, others who monitor neighborhoods, and still others who respond to complaints from community members. *Id*., Ex. C at 35.  The City's Director of Planning stated at a City Council hearing that the City's enforcement of its short-term rental law has been "certainly working" and "very effective."  *Id*., Ex. A at 4.  That has been even more true recently, as the City has "switched from mostly reactive to proactive enforcement" by designating enforcement officers to work in the evening and creating new methods by which residents can voice concerns regarding rentals, including online and by phone.  *Id.*

Despite the success of the City's regulation of short-term rentals, based on

---

[3] *See also* Appendix B (prior version of Ordinance), at 65.

"community concerns regarding incompatibility and neighborhood impacts," in September 2015 the City enacted a moratorium on the issuance of short-term rental permits to evaluate the state of short-term rentals in the City.  Blavin Decl., Ex. D at 37.  That moratorium was eventually extended through May of 2017.  *Id.* at 38. During the moratorium, City staff were tasked with researching potential alternative approaches to short-term rentals in Anaheim.  *Id.* at 42.  That research culminated with a City Council workshop on February 23, 2016, during which City staff presented findings regarding the state of the short-term rental market in Anaheim and potential paths forward.  *Id.*  Following that workshop, the Mayor instructed City staff to prepare the Ordinance.  *Id.* at 38, 40.  The City Council then initially considered the Ordinance at a special session on June 29, 2016 and passed the Ordinance on July 12, 2016.  The Ordinance will go into effect on August 11, 2016.  § 5.

The Ordinance fundamentally changes the City's scheme for regulating short-term rentals.  Previously, the City imposed penalties only on owners who violated the short-term rental law.  The Ordinance, by contrast, imposes penalties on not only the owner, but also on the hosting platform (and the renter).  *See* §§ 4.05.130 (providing for liability for "owner[s]," "responsible person[s]," and "hosting platform[s]"); 4.05.030(O) (defining "responsible person" as "an occupant" of the rental).

The Ordinance contains a section titled "Responsibilities of Hosting Platforms," which sets forth platforms' obligations.  First, it provides that "[n]o hosting platform shall list or advertise a short-term rental for which the city has not issued a permit." § 4.05.120.010.  Second, it requires hosting platforms, "[u]pon written or electronic notification from the city that the city has not issued a permit for a [listed] short term rental," to remove the listing from the platform within ten calendar days.  *Id.*  The "hosting platform thereafter shall not list or advertise the short term rental without written certification from the city that the required permit has been issued"—even if the rental is in compliance with the law.  *Id.*  Last, and most broadly, the Ordinance states that a "hosting platform shall not [] facilitate"— defined as *allowing the owner*

*to offer to list or advertise* the short-term rental on the Internet web site"—"the occupancy of a short-term rental if the occupancy will violate *any* ordinance, regulation or law of the city."  §§ 4.05.120.020; 4.05.030(E) (emphases added).

The Ordinance would hold hosting platforms liable for failing to verify numerous compliance requirements on short-term rentals before listing them.  For example, the platform would be liable if the short-term rental property has "double-keyed dead bolt locks" on "exit doors," or lacks a "property address . . . visible from the street and in contrasting colors" and "[s]moke alarms . . . installed in all habitable areas except the kitchen."  § 4.05.100.0103.  In addition, platforms would be liable if listed properties do not have off-street parking spaces (§ 4.05.100.0112), or a notice in the property regarding trash pick-up days (§ 4.05.100.0120(c)).  The Ordinance specifies no mechanism by which hosting platforms could determine whether particular short-term rentals are permitted or otherwise in compliance with City law.

In addition, the Ordinance specifies that short-term rental permits will no longer be issued within zoning districts "in which residential uses are a permitted or conditionally permitted use."  § 4.05.040.030.  The law also affects short-term rentals that already have permits:  It allows certain "pre-moratorium short term rentals"— defined as rentals issued a permit or with a pending application before August 11, 2016—to continue, but a separate law passed by the City states that pre-moratorium rentals will be phased out in eighteen months.  *See* Appendix C, at § 4.05.180.010.

The Ordinance imposes significant penalties on hosting platforms that fail to meet its requirements.  First, it provides for criminal liability, stating that "any violation of this chapter may constitute a misdemeanor, which may be subject to the maximum punishment therefor as allowed by law," which under the Anaheim Municipal Code, would include imprisonment of up to six months.  § 4.05.130.020; Ana. Mun. Code § 1.01.370.  The City also may issue "a civil citation to . . . the hosting platform if there is any violation … committed, caused or maintained by [the hosting platform]."  § 4.05.130.010.  Civil citations can be issued without "warning

or notice to cure" and "[e]ach and every day, or portion thereof, that a violation . . . exists constitutes a separate and distinct violation." *Id.* A first offense results in a $500 citation, and subsequent offenses result in increased penalties of up to $2,000 per violation. § 4.05.130.0103. Last, the Ordinance declares that failure "to comply with any of the requirements of this chapter" constitutes a public nuisance, punishable by "civil action and/or criminal prosecution." § 4.05.130.030.

In passing the Ordinance, the City was well aware that it might conflict with federal law. Indeed, the Ordinance itself contains two specific references to the potential conflict. First, the portion of the Ordinance imposing duties on hosting platforms contains a clause stating that "[t]he provisions of this section shall be interpreted in accordance with otherwise applicable state and federal law(s) *and will not apply if determined by the city to be in violation of any such law(s).*" § 4.05.120.030 (emphasis added). Second, the Ordinance's penalty provision for hosting platforms states that hosting platforms will be subject to administrative penalties "[u]nless prohibited by any state or federal law." § 4.05.130.0103.

During a City Council hearing, the Director of Planning explained the insertion of these clauses, stating that hosting platforms "have protections under various forms of federal law" and that "if we're in contradiction or if we've been preempted by federal law, we would not be able to issue that citation." Blavin Decl., Ex. A at 8. The acting City Attorney, along similar lines, stated that the City was aware that it was regulating "hosting platforms," and that they "have federal rights . . . with respect to their content," though claimed that "it's an issue that we're still looking at." *Id.* at 24. The City has not made any determination that the Ordinance violates federal or state law, and the law remains in force and will become effective on August 11, 2016.

## III.   ARGUMENT

### A.   Standard for Preliminary Injunction

"A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of

preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Farris*, 677 F.3d at 864.  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*.  Airbnb satisfies both standards.  It is overwhelmingly likely to succeed on its CDA and constitutional claims, and it is threatened with irreparable harm in light of the substantial penalties it faces under a preempted law, as well as the infringement of its constitutional rights and erosion of goodwill.  The balance of equities and public interest also favor an injunction.

> ### B.     <u>Airbnb is Likely To Succeed on the Merits of its Claims</u>
> #### 1.     The City's Enforcement of the Ordinance Against Airbnb Violates and Is Preempted By Section 230 of the CDA

The CDA unequivocally bars states and localities from imposing liability on websites premised on their role as a publisher of third-party content.  Because this is precisely what the Ordinance does, it violates the CDA and is preempted.

Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The law bars liability "under any State or local law that is inconsistent with this section."  *Id*. § 230(e)(3).  In providing a "broad grant of webhost immunity," the CDA "gives effect to Congress's stated goals" of "'promot[ing] the continued development of the Internet and other interactive computer services,'" and "'preserv[ing] the vibrant and competitive free market that presently exists for the Internet.'"  *Fair Hous. Council of San Fernando Valley v. Roommates.com*, *LLC,* 521 F.3d 1157, 1174-75, 1180 (9th Cir. 2008) (en banc) (quoting § 230(b)(1), (2)); *see also Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (objective of CDA is "to promote the development of e-commerce").  And by eliminating the threat of liability based on sites' efforts to screen user content, the

1  CDA incentivizes the creation of innovative platforms while "encourag[ing] voluntary

2  monitoring." *Carafano v. Metrosplash.com*, 339 F.3d 1119, 1122-23 (9th Cir. 2003).

3         This "broad construction accorded to section 230 as a whole has resulted in a

4  capacious conception of what it means to treat a website operator as the publisher or

5  speaker of information provided by a third party." *Jane Doe No. 1 v. Backpage.com,*

6  *LLC*, 817 F.3d 12, 19 (1st Cir. 2016).  Consistent with this, a long line of cases have

7  held that Section 230 provides immunity for online marketplaces, classifieds, and

8  other sites similar to hosting platforms from any liability stemming from their role as

9  a publisher of third-party listings and advertisements.[4]  As the Ninth Circuit has

10  instructed, "close cases … must be resolved in favor of immunity, lest we cut the

11  heart out of section 230 by forcing websites to face death by ten thousand duck-bites

12  …." *Roommates*, 521 F.3d at 1174.

13         In applying the CDA, courts look to "whether the duty" the law imposes

14  "derives from the defendant's status or conduct as a 'publisher or speaker.'  If it does,

15  section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1101-02.  There can be no

16  question that the duty and liabilities the Ordinance imposes on hosting platforms

17  derive from their status as publishers of third-party content.  The law imposes criminal

18  and civil penalties for platforms' publishing and failing to remove certain third-party

19  listings.  In short, if platforms do not engage in government-mandated screening of

20  listings, they face liability.  It is well settled that the CDA prohibits such efforts.

---

21  [4] *See, e.g.*, *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816 (2002) (eBay immune from

22  liability for fake sports memorabilia listings); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d
961, 967 (N.D. Ill. 2009) (claim that Craigslist adult section listings were public

23  nuisance barred by CDA); *Mazur v. eBay Inc.*, 2008 WL 618988, at *9 (N.D. Cal.
Mar. 4, 2008) (eBay immune from claim it failed to screen listings); *Home Decor*

24  *Ctr., Inc. v. Google, Inc.*, 2013 WL 10858861, at *7-8 (C.D. Cal. May 9, 2013)
("courts have repeatedly dismissed claims against Google which attempt to impose

25  liability for claims arising out of third parties'" ads on Google); *Hill v. StubHub, Inc.*,
219 N.C. App. 227, 247-48 (2012) (claim that StubHub hosting of event ticket sales

26  violated law barred by CDA); *Inman v. Technicolor USA, Inc.*, 2011 WL 5829024, at
*7 (W.D. Pa. Nov. 18, 2011) ("eBay may not be held liable under the CDA" for

27  "facilitat[ing]" sale); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v.*
*Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008) (Craigslist immune under CDA).

28

Section 230 protects (1) a "provider or user of an interactive computer service" from (2) any "state law" that "seeks to treat" it "as a publisher or speaker" (3) "of information provided by another information content provider." *Barnes,* 570 F.3d at 1100-01.  Each of these elements is met here.

> ### (a)    Hosting Platforms Are "Interactive Computer Service" Providers

Hosting platforms like Airbnb provide information to "multiple users" by giving them "access . . . to a computer server" (47 U.S.C. § 230(f)(2)), and therefore are interactive computer service providers under the CDA.  *Roommates*, 521 F.3d at 1162 n.6.  Indeed, the "most common interactive computer services are websites." *Id.*

> ### (b)    The Ordinance Treats Platforms as "Publishers"

Under the CDA, "[w]hat matters is not the name of the cause of action," but whether the law "inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F. 3d at 1101-02.  Here, the obligations and liability imposed by the Ordinance plainly treat hosting platforms as publishers or speakers of third-party content, and are thus barred by the CDA.

> #### (i)    The Ordinance Imposes Liability for Publishing and for Failing to Remove Third-Party Content

The Ordinance violates the CDA by imposing liability on hosting platforms for publishing, and for failing to remove, non-compliant third-party listings.

The Ordinance imposes significant criminal and civil penalties on hosting platforms for "list[ing] or advertis[ing] a short-term rental for which the city has not issued a permit" or which otherwise "violate[s] any ordinance, regulation or law of the city." §§ 4.05.120.010-.020; 4.05.030(E).  It further provides that upon receiving notification from the City that a rental advertised on its site does not have a permit, the platform faces liability for failing to "remove the listing or advertisement" within 10 days, and thereafter for "list[ing] or advertis[ing]" the rental "without written certification from the city that the required permit has been issued." § 4.05.120.010.

These provisions are squarely barred by the CDA.  Section 230 "provides

broad immunity for publishing content provided primarily by third parties."
*Carafano*, 339 F.3d at 1123.  Courts thus repeatedly have enjoined the enforcement
of statutes like the Ordinance that impose liability for websites' publishing of third-
party listings and ads.  In *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262
(W.D. Wash. 2012), for example, the court preliminarily enjoined a Washington state
statute on the basis that it was likely "inconsistent with and therefore expressly
preempted by Section 230" because it "impos[ed] liability" on websites for
knowingly "publishing" or "causing to be published" certain prohibited "ads for
commercial sex acts" and therefore "treat[ed]" websites as "the publisher or speaker
of information created by third parties."  *Id*. at 1273-74 (citing *Barnes*, 570 F.3d at
1101-02).  Several other courts similarly have enjoined laws that impose liability
based on the publication of third-party ads.  *See Backpage.com, LLC v. Hoffman*,
2013 WL 4502097, at *6 (D.N.J. Aug. 30, 2013) (enjoining statute that "runs afoul of
Section 230 by imposing liability" for "publishing" third-party ads); *Backpage.com,
LLC v. Cooper*, 939 F. Supp. 2d 805, 824 (M.D. Tenn. 2013) (enjoining statute where
"sale of online advertisements regulated by [law] derives" from site's "status" as
"publisher").  No different here, because the Ordinance directly imposes liability on
platforms for their publication of third-party listings, it is preempted by the CDA.

Equally prohibited by Section 230 is the Ordinance's imposition of liability for
hosting platforms' failure to *remove* certain listings upon receiving notice from the
City.  As Ninth Circuit has held, the CDA was "enacted to protect websites against
the evil of liability for failure to remove offensive content."  *Roommates.com*, 521
F.3d at 1174.  This is true even where, as here, the website receives notice of the
objectionable content, because to "impose liability on the basis of such conduct
necessarily involves treating the liable party as a publisher of the content it failed to
remove."  *Barnes*, 570 F.3d at 1102-03; *see also Gavra v. Google Inc.*, 2013 WL
3788241, at *2 (N.D. Cal. July 17, 2013) (CDA provides immunity where website
"refrain[s] from removing objectionable content, despite receiving notice" of it).

**(ii)     The Ordinance Imposes Liability for Failing to Verify and Screen Third-Party Content**

Relatedly, the Ordinance is barred by the CDA because to assure compliance with its prohibition on listing unpermitted or otherwise non-compliant rentals, platforms must verify and screen third-party listings prior to publishing them.

It is well settled that "[s]creening" a listing "is akin to deciding whether to publish" and a website "is immune under section 230 for its screening decisions." *Mazur*, 2008 WL 618988, at *9 (eBay immune for alleged failure to screen listings); *see Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1322 n.3 (11th Cir. 2006) (CDA "clearly inconsistent with state law that makes" sites "liable based on their efforts to screen"); *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) (CDA bars "attempts to hold [site] liable for decisions relating" to "monitoring" and "screening").

Similarly, the CDA protects sites from any liability for their failure to verify information associated with a listing—such as here, permit information.  In *Jane Doe No. 1 v. Backpage.com*, the plaintiffs challenged several "choices that Backpage has made about the posting standards for advertisements" that they claimed were "designed to encourage sex trafficking," such as the lack of "phone number verification" for numbers in ads, as well as the "option to anonymize e-mail addresses" and the site's "acceptance of anonymous payments."  817 F.3d at 16, 20-21.  The First Circuit rejected the argument that such conduct was "distinguishable from publisher functions," holding that the CDA "extends to the formulation of precisely the[se] sort of website policies and practices."  *Id*. at 20.  Such features reflect "choices about what content can appear on the website and in what form," and an operator's "decisions in structuring its website and posting requirements are publisher functions entitled to section 230(c)(1) protection."  *Id*. at 21-22[5]; *see also*

---

[5] Numerous other courts similarly have held that any obligation to verify information associated with third-party content prior to publishing it is barred by the CDA.  *See, e.g.*, *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 294-95 (D.N.H. 2008) ("§ 230 bars" claims that defendants "fail[ed] to verify that a profile corresponded to

1   *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 422 (1st Cir. 2007) (CDA

2   protects against claims challenging "construct and operation" of "web sites").

3       Likewise, the Ordinance holds hosting platforms liable for failing to verify and

4   screen listings based on whether rentals have been issued a permit by the City and are

5   otherwise compliant with City laws.  It directly regulates their decisions regarding the

6   structure and operation of their websites.  Before allowing a host to publish a listing,

7   platforms must verify whether the listing has been issued a permit—by either

8   checking whether the permit number is in the listing, requesting permit information

9   from the host, or seeing if it is published elsewhere, and then must confirm that any

10   alleged permit is valid.  *See* Owen Decl., ¶¶ 13-17.  Platforms also must determine

11   whether the rental is in compliance with *all* other aspects of City law, no matter how

12   burdensome—indeed impossible—compliance with such an obligation would be.  *Id*.

13       These requirements squarely violate the CDA and undermine its core policies.

14   In *Cooper*, for example, a Tennessee state law required a website to show, as a

15   defense to a claim that it published third-party sex ads depicting a minor, that "prior

16   to publication" of the ad, it obtained the minor's "driver license" or "other

17   governmental" identification, which the court found amounted to "in-person

18   identification verification."  939 F. Supp. 2d at 824-25.  In holding that the law

19   violated the CDA and enjoining its enforcement, the court emphasized that to avoid

20   "significant penalties for certain ads," websites would need to "screen[] millions of

21   advertisements" which "would likely undermine" the "goals supporting CDA

22   immunity," as sites would "likely be forced to eliminate user postings" rather "than

23   face possible liability," and would "relax their current self-policing."  *Id*.  Similarly,

24   in enjoining a near-identical provision under Washington law, the *McKenna* court

25   held that "by imposing liability on online service providers who do not pre-screen

26

27   the submitter's true identity"); *Doe v. MySpace, Inc*., 474 F. Supp. 2d 843, 850 (W.D.
Tex. 2007), *aff'd*, 528 F.3d 413 (5th Cir. 2008) (claims that "MySpace liable for

28   ineffective … policies relating to age verification" were "barred under" CDA).

content," the "statute drastically shifts the unique balance that Congress created with respect to the liability of online service providers that host third party content." 881 F. Supp. 2d at 1274. The same is true here—by requiring platforms to verify and screen listings prior to publication, the Ordinance violates the CDA.

**(c)** **Listings On Hosting Platforms Are Provided By "Another Information Content Provider"**

Section 230 encompasses "*any information* provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Here, listings advertising rentals without City permits or otherwise not in compliance with City law are content provided by "another information content provider"—third-party hosts.

Third parties, not hosting platforms, create and provide the listings at issue. As the Ordinance acknowledges, a hosting platform like Airbnb is an "entity" that "*allow[s] the owner to offer to list or advertise* the short-term rental on the Internet web site provided or maintained by" the platform. § 4.05.030(E) (emphasis added). Third-party hosts create and provide descriptions of their listings and set the lengths of any particular rental. Further, hosts are responsible for obtaining a permit from the City, including their "city-issued permit number" in "all advertising," and ensuring that their listings only advertise rentals that otherwise comply with City law. §§ 4.05. 100.0109; 4.05.040. Platforms like Airbnb do not create the listings on their sites posted by hosts, have no property interests in the rentals advertised, and have no ability to obtain permits or ensure that the rentals are legally compliant. Thus, the law plainly imposes liability on platforms for their role publishing third-party content.

Additionally, that a website provides third parties with "neutral tools to create web content, even if the website knows" they "are using such tools to create illegal content," does not render the site a "content provider." *Goddard*, 640 F. Supp. 2d at 1198; *Carafano*, 339 F.3d at 1124-25 ("menu" of "pre-prepared responses" protected). Nor does a site lose immunity if it "fails to take action despite notice" of unlawful content. *Black v. Google Inc.*, 2010 WL 3222147, at *3 (N.D. Cal. Aug. 13, 2010); *Home Decor*, 2013 WL 10858861, at *7-8 (neither Google's "authorization of each

-16-

ad," nor "allegations that [it] profited from" ads, permit claims "to escape" CDA. Finally, that sites like Airbnb may enable the processing of transactions, impose fees for their services, and offer additional functionality does not affect the CDA's applicability. *Backpage.com*, 817 F.3d at 16-17, 21; *StubHub*, 219 N.C. App. at 245-46 (that StubHub "'controlled' the transaction by acting as an intermediary between buyer and seller" and offered "certain guarantees and assumed responsibility for handling the mechanics required to complete the transaction," irrelevant under CDA).

### 2.  The Ordinance Violates the First Amendment Because It Is a Content-Based Restriction on Speech that Is Not Narrowly Tailored to Serve a Substantial Government Interest

Separately, Airbnb is likely to succeed in demonstrating that the Ordinance violates the First Amendment.  The Ordinance seeks to proscribe and punish speech, in the form of advertisements and online rental listings, based on the content of that speech:  whether the listings advertise certain types of short-term housing rentals. The City cannot justify that restriction under the First Amendment.

There is no question that the Ordinance's prohibition on certain rental listings seeks to punish speech.  It imposes both criminal and civil penalties on any "hosting platform" that "list[s] or advertise[s]" any "short-term rental for which the city has not issued a permit."  § 4.05.120.010.  If the City sends a hosting platform notification that a listing is unpermitted, the platform may not "list or advertise the short-term rental without written certification from the city that the required permit has been issued."  *Id.*  And a platform may not "facilitate … the occupancy of [any] short-term rental"—defined as "allowing the owner to offer to list or advertise" the rental— where the "occupancy will violate any ordinance, regulation or law of the city." §§ 4.05.120.020; 4.05.030(E).  These prohibitions implicate hosting platforms' First Amendment rights because publishing advertisements for products or services constitutes protected speech. *See, e.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 818 (1975).

There also is no question that the Ordinance imposes a "content- and speaker-based" restriction, which "requires heightened judicial scrutiny." *Sorrell*, 564 U.S. at

570; *see Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).  A restriction is content-based if, to enforce it, the government "must necessarily examine the content of the message that is conveyed." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *see Reed*, 135 S. Ct. at 2227.  To enforce the Ordinance, the City must examine the content of listings to determine whether they advertise unpermitted or non-compliant rentals; indeed, the law contemplates the City sending notices to platforms with respect to particular listings.  §§ 4.05.120.010, 4.05.120.020.  Similarly, the restriction is speaker-based because it applies only to a certain category of speakers, "singl[ing] out" hosting platforms "for disfavored treatment," *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011), while exempting other categories of speakers, such as licensed real estate brokers, *see* § 4.05.030(E).

  "In the ordinary case, it is all but dispositive to conclude that a law is content-based." *Sorrell*, 564 U.S. at 571.  Such laws are "presumed invalid" under the First Amendment, and "the Government bear[s] the burden of showing their constitutionality." *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).  This presumption of invalidity applies even in the context of commercial speech.[6]  "Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571-72; *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980).  It must show "that the statute directly advances a substantial government interest" and that there is a "'fit between the legislature's ends and the means chosen to accomplish those ends.'" *Sorrell*, 564 U.S. at 572; *see also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (in commercial speech context, law must be "'narrowly tailored to achieve the desired objective'"); *Cent. Hudson*, 447 U.S. at 564-66.  There also is an efficacy requirement:  the government must establish that the challenged restriction

---

[6] Airbnb does not concede that "all speech hampered by [the law] is commercial," but proceeds under a commercial-speech analysis because "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *Sorrell*, 564 U.S. at 571.

MOTION FOR PRELIMINARY INJUNCTION

1  advances its interest "in 'a direct and effective way.'"  *Edenfield v. Fane*, 507 U.S.

2  761, 773 (1993).  "[M]ere speculation or conjecture" will not suffice.  *Id.* at 770.

3        The City is highly unlikely to be able to demonstrate either that the Ordinance

4  is a narrowly tailored means of achieving any substantial government interest or that

5  the Ordinance is a direct and effective way of doing so.  With respect to narrow

6  tailoring, even assuming that punishing the publication of listings for short-term

7  rentals serves a substantial government interest (which is far from clear), the City

8  cannot show that a *restriction on speech* is necessary to achieve that interest.  "The

9  normal method of deterring unlawful conduct is to impose an appropriate punishment

10  on the person who engages in it," not to punish those who engage in speech regarding

11  the conduct.  *Bartnicki*, 532 U.S. at 529; *see also Village of Schaumburg v. Citizens*

12  *for a Better Env't*, 444 U.S. 620, 637 (1980) (invaliding speech restriction where

13  conduct "can be prohibited and the penal laws used to punish such conduct directly").

14        That principle is especially relevant here, where the City has acknowledged that

15  it could—and indeed, *already does*—enforce its prohibition on short-term rentals

16  directly against hosts.  The City has established a "hotline" that residents can call to

17  report unlawful short-term rentals, and employs 31 code-enforcement officers to

18  enforce the law, three of whom monitor platform listings and "respond immediately in

19  the field" to alleged violations.  Blavin Decl., Exs. A at 4, C at 35.  The Director of

20  Planning has stated that this enforcement scheme is "certainly working" and has

21  "been very effective."  *Id.*, Ex. A at 4.  Hosts who are found to be in violation of the

22  City's short-term rental laws face fines of up to $2,500.  *See* § 4.05.130.0102.

23        The City has not even attempted to explain why a restriction on speech is

24  necessary to achieve its aims.  On the contrary, the City's own experience confirms

25  that direct enforcement of the law against hosts is both feasible and effective.  This

26  dooms the Ordinance under the First Amendment.  *See, e.g.*, *Valle Del Sol Inc. v.*

27  *Whiting*, 709 F.3d 808, 826-27 (9th Cir. 2013) (enjoining anti-solicitation law where

28  state did not show ineffectiveness of directly enforcing "preexisting" laws to "address

1   legitimate traffic safety concerns" instead of restricting speech); *McKenna*, 881 F.

2   Supp. 2d at 1284 (invaliding law banning publication of ads for sexual encounters

3   because state had "fail[ed] to demonstrate why a law targeting only the individuals

4   who post ads would not be effective, rather than seeking to impose felony liability on

5   online service providers"); *Cooper*, 939 F. Supp. 2d at 840 (similar).

6          The City cannot argue that the Ordinance's imposition of liability on hosting

7   platforms is justified for efficiency reasons.  The First Amendment precludes the

8   government from restricting advertising and speech simply because it may be more

9   politically or administratively convenient than a direct regulation of conduct.  *See*

10  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) (speech restrictions must

11  be "a necessary as opposed to merely convenient means of achieving [government's]

12  interests"); *Yniguez v. Arizonans for Official English*, 42 F.3d 1217, 1234 (9th Cir.

13  1994) ("The government cannot restrict the speech of the public … just in the name

14  of *efficiency*.").  The City seeks to place the burden of verifying each host's

15  compliance with the law on hosting platforms—a burden that is likely to be

16  overwhelming, given the effort needed to verify that *every* short-term rental in the

17  City listed on Airbnb does not advertise an occupancy that would violate "*any*

18  ordinance, regulation or law of the city."  § 4.05.120.020 (emphasis added); *see*

19  Owen Decl., ¶¶ 16-17.  But the government may not seek to "shift[] the burden of

20  enforcing the law from the taxpayer" to speakers or publishers of information simply

21  because it is easier to do so.  *News & Sun Sentinel Co. v. Bd. of Cnty. Comm'rs*, 693

22  F. Supp. 1066, 1072 (S.D. Fla. 1987).

23         For similar reasons, the City will be unable to establish that the Ordinance

24  achieves the City's interests in "'a direct and effective way.'"  *Edenfield*, 507 U.S. at

25  773.  By its own terms, the law operates in an *indirect* way:  it targets the behavior of

26  short-term rental hosts by imposing liability on hosting platforms.  Nor has the City

27  offered any data or evidence to suggest that restricting the First Amendment rights *of*

28  *platforms*, as opposed to regulating the conduct of hosts or guests, will be effective in

targeting the "concerns" the City claims flow from short-term rentals, such as "noise," "parking," and homes that "no longer reflect the character of the community."  Blavin Decl., Ex. A at 3.  Courts have invalidated restrictions on commercial speech where, as here, the argument that a restriction will serve a substantial government interest is "speculati[ve]" at best.  *Edenfield*, 507 U.S. at 770-71 (restriction invalidated where state presented no "studies" or other "evidence" that law would achieve aims).

Although it may seek to target primarily listings advertising unlawful rentals,[7] the Ordinance inevitably will have an impermissible chilling effect on protected commercial speech.  Unlike "narcotics or soliciting prostitutes," *cf. Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rights*, 413 U.S. 376, 388-89 (1973), many short-term rentals remain lawful in Anaheim, subject to certain conditions and restrictions.  There is no practical way for hosting platforms to determine, from the face of a listing, whether it advertises a lawful rental or not.  Hosting platforms likely would be chilled from publishing *any* listings in Anaheim, even lawful ones, to avoid the criminal sanction and fines the Ordinance imposes.  Owen Decl., ¶ 19.  The Ordinance thus would "impermissibly impose a form of self-censorship" on platforms like Airbnb that cannot distinguish between lawful and unlawful ads.  *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1117, 1118 (11th Cir. 1992) (First Amendment protection applies unless ad is unlawful "on its face"); *cf. Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) (speech restrictions under the First Amendment must not "chill[] protected commercial speech").

### 3.   The Ordinance Violates the First Amendment and Due Process Clause Because It Imposes Criminal Penalties on Speech Without Any Scienter or *Mens Rea* Requirement

Apart from constituting an impermissible content-based restriction on speech, the Ordinance should be invalidated for the additional reason that it seeks to impose

---

[7] In reality, the law does *not* target only listings for unlawful rentals:  it bars platforms from publishing any listing ever deemed unpermitted by the City, without obtaining "certification from the city that the required permit has been issued."  § 4.05.120.010. This restriction applies even if the listing advertises a lawful, permitted rental.

1    criminal penalties on hosting platforms like Airbnb without requiring a showing that

2    the platform *knew* the published listing at issue was unlawful.  For instance, the

3    Ordinance makes it unlawful for any hosting platform to "list or advertise a short-term

4    rental for which the city has not issued a permit," regardless of whether the platform

5    *knows* the City has not issued a permit.  § 4.05.120.010.  Even more expansively, the

6    Ordinance makes it unlawful for a hosting platform to list any rental whose

7    "occupancy will violate *any* ordinance, regulation or law of the city."  § 4.05.120.020

8    (emphasis added).  Thus, for instance, if a rental does not have at least two off-street

9    parking spaces (§ 4.05.100.0112), lacks smoke alarms (§ 4.05.100.0103(b)), or if a

10   host fails to post a notice regarding trash pick-up days (§ 4.05.100.0120(c)), the law

11   imposes liability on the *hosting platform*.  The City, in short, seeks to create a strict-

12   liability crime for publishing ads for rentals that prove to be unlawful for one reason

13   or another, even if the hosting platform has no knowledge of the violation.

14         The First Amendment and the Due Process Clause do not permit this approach.

15   The Supreme Court has long rejected the imposition of strict criminal liability for the

16   possession or dissemination of information, even where the content itself lacks First

17   Amendment protection.  *See Ferber*, 458 U.S. at 765 (where First Amendment is

18   implicated, "criminal responsibility may not be imposed without some element of

19   scienter"); *Smith v. California*, 361 U.S. 147, 150-51 (1959).  This element is

20   necessary in order "to avoid the hazard of self-censorship of constitutionally protected

21   material."  *Mishkin v. New York*, 383 U.S. 502, 511 (1966); *see United States v. U.S.*

22   *Dist. Ct. for the Cent. Dist. of Cal.*, 858 F.2d 534, 540 (9th Cir. 1988) ("[T]he First

23   Amendment does not permit the imposition of criminal sanctions on the basis of strict

24   liability where doing so would seriously chill protected speech.").  Those concerns are

25   fully implicated here, where the law would impose criminal liability on hosting

26   platforms for *any* listing where the rental proves to be unlawful for *any* reason,

27   without requiring the government to make *any* showing that the platform knew of the

28   illegality.  The Supreme Court has rightly interpreted the Constitution to prohibit that.

**C.**   **Airbnb Faces Irreparable Harm Unless the Ordinance is Enjoined**

For several reasons, Airbnb is likely to suffer irreparable harm.

*First*, Airbnb faces the threat of prosecution and significant penalties under a preempted law, which the Ninth Circuit and other courts have recognized constitutes irreparable harm.  *See Valle del Sol*, 732 F.3d at 1029 ("irreparable harm" where there was "a credible threat of prosecution" under preempted law); *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1269 (11th Cir. 2012) (irreparable harm where "Plaintiffs are under the threat of state prosecution for crimes that conflict with federal law"); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" where state governments "made clear that they would seek to enforce" preempted law and plaintiffs face "Hobson's choice" of "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" law).

*Second*, Airbnb's loss of First Amendment freedoms, even for minimal periods of time, "'unquestionably constitutes irreparable injury.'"  *Farris*, 677 F.3d at 868.

*Third*, the risk of criminal penalties, including possible jail time, if the City is permitted to enforce the Ordinance additionally constitutes irreparable harm.  *See Hoffman*, 2013 WL 4502097, at *12 (irreparable harm where, "[a]bsent injunctive relief, Plaintiffs may face serious criminal liability"); *Toomer v. Witsell*, 334 U.S. 385, 392 (1948) (where "defiance would have carried with it the risk of heavy fines and long imprisonment," plaintiff had shown "imminence of irreparable injury").

*Fourth*, the risk of fines reaching into the millions of dollars or more constitutes irreparable harm.  The Ordinance authorizes fines of up to $2,000 daily for each violation.  Courts have found irreparable harm based on fines of this magnitude.  *See, e.g.*, *Satellite Television of N.Y. Assocs. v. Finneran*, 579 F. Supp. 1546, 1551 (S.D.N.Y. 1984) (irreparable harm "readily" shown for a "fine of $2,000 a day").

The prospect of Airbnb facing criminal and civil penalties, moreover, is not just speculative or hypothetical.  The Ordinance squarely takes aim at Airbnb's business operations, and indeed the City has explicitly described it as targeted at Airbnb.

Blavin Decl., Ex. A at 24.  In these circumstances, courts have not hesitated to find irreparable harm based on the high likelihood of enforcement.  *See Cooper*, 939 F. Supp. 2d at 819 (high likelihood of enforcement where Backpage.com was "direct target" of law); *McKenna*, 881 F. Supp. 2d at 1270 (same).

*Fifth*, the Ordinance also gives rise to irreparable harm by being highly disruptive to Airbnb's operations and threatening a loss of consumer goodwill.  For all present and future Anaheim listings (there are presently approximately 629), Airbnb would need to verify whether such rentals are permitted and otherwise in compliance with City law, but the law does not provide any procedures for how to accomplish that.  Owen Decl. ¶ 18.  Airbnb not only would need to redesign how its website operates for hosts, but also presumably would need to physically inspect every Anaheim property on its site to determine whether the rental complies with all City laws.  *Id*. ¶¶ 15-16.  Compliance with these provisions would be extremely burdensome, if not impossible, as Airbnb does not have the personnel or expertise to inspect properties to determine whether they comply with City law.  *Id*. ¶ 17.  Even if compliance were theoretically feasible—which likely would require a dedicated team of employees devoted fulltime—establishing, testing and implementing processes to check all listings would take a significant period of time and resources.  *Id*.

As such, the only way Airbnb could avoid the law's substantial penalties, which go into effect on August 11, would be to remove all Anaheim listings from its site.  *Id*. ¶ 19.  This would include the removal of listings that may otherwise be in compliance with the law as Airbnb will not have the ability to confirm their legality.  *Id*.  As a result of this significant disruption to its business, and a loss of consumers who may never return to Airbnb even if the law is ultimately overturned, Airbnb faces the serious risk of an erosion in consumer trust and goodwill.  *Id*. ¶ 20.  This constitutes irreparable harm.  *Am. Trucking*, 559 F.3d at 1058 (irreparable harm where preempted law will cause "part of" plaintiff's "business" and "goodwill" to "evaporate"); *Mahroom v. Best W. Int'l, Inc.*, 2009 WL 248262, at *3 (N.D. Cal. Feb. 2, 2009)

1    ("[m]ajor disruption" of business threatening "goodwill" is "irreparable harm").

2         Additionally, when unlawful regulations create the perception that a company's

3    activities are illegal, the resulting loss in customer goodwill is irreparable. *See*

4    *Aeroground, Inc. v. City & Cnty. of San Francisco*, 170 F. Supp. 2d 950, 959 (N.D.

5    Cal. 2001) (irreparable harm to goodwill where party "is refusing to comply with a

6    rule that it believes is preempted by federal law").  Here, the law engenders the

7    inaccurate perception that Airbnb's activities may be illegal, creating confusion

8    among hosts and guests alike, and driving consumers away from the platform.

9         **D.    The Balance of Equities and Public Interest Favor Airbnb**

10        The balance of equities tips decidedly in favor of Airbnb.  Airbnb faces

11   deprivation of its constitutional rights, which far outweighs any harm the City might

12   claim.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  Harms to

13   Airbnb in the form of impending criminal penalties and fines, as well as lost goodwill,

14   also weigh in its favor.  The City can claim little harm to outweigh these significant

15   injuries:  The Ordinance does not become effective until August 11, so the City does

16   not face disruption of established practices.  *McKenna*, 881 F. Supp. 2d at 1286

17   ("harm" to "government [not] great" where "'[n]o prosecutions" have been []taken'").

18        The public interest also strongly favors Airbnb.  The public interest is served by

19   "the Constitution's declaration that federal law is to be supreme."  *Am. Trucking*, 559

20   F.3d at 1059-60; *see Bank One, Utah v. Guttau*, 190 F.3d 844, 847-48 (8th Cir. 1999)

21   ("public interest will perforce be served by enjoining the enforcement of [preempted]

22   state law").  In addition, "'it is always in the public interest to prevent the violation of

23   a party's constitutional rights.'"  *Melendres*, 695 F.3d at 1002.  It also is in the public

24   interest to protect Airbnb from criminal liability and lost consumer goodwill resulting

25   from unlawful regulation.  By contrast, an injunction would not prevent the City from

26   enforcing its laws against non-compliant hosts who directly violate them.

27   **IV.   CONCLUSION**

28        For the foregoing reasons, the Court should grant the Motion.

1   DATED:  July 28, 2016                     MUNGER, TOLLES & OLSON LLP

2

3

4
                                             By:  */s/ Jonathan H. Blavin*
5                                                 JONATHAN H. BLAVIN
6                                            Attorneys for Plaintiff Airbnb, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28